ELECTRONICALLY FILED
Lonoke County Circuit Court
Deborah Oglesby, Circuit Clerk
2016-Dec-19  14:00:39
43CV-16-767
C23D03 : 12 Pages

## IN THE CIRCUIT COURT OF LONOKE COUNTY, ARKANSAS
## CIVIL DIVISION

**OLD REPUBLIC GENERAL INSURANCE CORPORATION,**
**individually and as subrogee of KOSS CONSTRUCTION**
**COMPANY**                                                              **PLAINTIFF**

v.                                    **CASE NO.** _____

**THE  CINCINNATI SPECIALTY UNDERWRITERS**
**INSURANCE COMPANY; and NATIONAL UNION**
**FIRE INSURANCE COMPANY OF PITTSBURGH, PA.**             **DEFENDANTS**

### COMPLAINT

Old Republic General Insurance Corporation, for its complaint against The Cincinnati Specialty Underwriters Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA., states:

### PARTIES

1.      Old Republic General Insurance Corporation ("Old Republic") is an Illinois corporation with its principal place of business in Illinois.

2.      The Cincinnati Specialty Underwriters Insurance Company ("Cincinnati") is a Delaware corporation with its principal place of business in Ohio.

3.      National Union Fire Insurance Company of Pittsburgh, Pa. ("National") is a Pennsylvania corporation with its principal place of business in New York.

### JURISDICTION AND VENUE

4.      This is an action seeking contribution based on Old Republic's discharge of more than its share of a common liability.

5.      This Court has jurisdiction over the subject matter of this complaint because the relief requested is within the statutory parameters for this Court.

**EXHIBIT**

**A**

6.      This Court has personal jurisdiction over the defendants because (1) they purposefully availed themselves of the privilege of conducting business in Arkansas by issuing insurance contracts to Arkansas Sign & Barricade, Inc. related to Arkansas Sign & Barricade, Inc.'s operations in Arkansas and (2) this claim arose out of the insurance policies the defendants issued to Arkansas Sign & Barricade, Inc.

7.      Pursuant to Arkansas Code Annotated § 16-60-101(a)(1), venue is proper in this court because a substantial part of the errors and omissions that gave rise to the claim occurred in Lonoke County.

## FACTUAL BACKGROUND

### A. Contract Between Koss Construction Company And The Arkansas State Highway Commission

8.      On or around October 11, 2011, Koss Construction Company ("Koss") entered into a contract ("General Contract") with the Arkansas State Highway Commission to perform construction work on Interstate 40 (the "Project"). A true and correct copy of the General Contract is attached as Exhibit 1 and incorporated by reference.

9.      The General Contract calls for Koss to provide traffic control for the Project.

10.     One of the traffic control measures required by the General Contract was providing a Traffic Control Supervisor for the site 24 hours per day, seven days per week.

11.     The General Contract incorporated by reference the Arkansas 2003 Standard Specification for Highway Construction. *See* Ex. 1 at GEN_CON 000001.

12.     The Arkansas 2003 Standard Specification for Highway Construction defines the duties of a Traffic Control Supervisor, which include reviewing the project for additional traffic control measures needed to delineate hazards caused by the contractor's operations, correcting all traffic control deficiencies, and providing emergency maintenance of traffic control devices as

2

needed.  A true and correct copy of Division 600 of the Arkansas 2003 Standard Specification for Highway Construction available on the Arkansas Highway Department website is attached as Exhibit 2.

13.     The Arkansas 2003 Standard Specification for Highway Construction also provides that the Traffic Control Supervisor must inspect all traffic control devices at least once a day.  See Ex. 2 at 405.

14.     The Arkansas 2003 Standard Specification for Highway Construction requires that the Traffic Control Supervisor conduct at least one inspection per week at night.  Ex. 2 at 405.

**B.      Contract Between Koss And Arkansas Sign & Barricade, Inc.**

15.     On or around October 10, 2011, Koss entered into a subcontract agreement ("Subcontract") with Arkansas Sign & Barricade, Inc. ("ASB").  A true and correct copy of the Subcontract is attached as Exhibit 3 and incorporated by reference.

16.     The Subcontract incorporated by reference the General Contract.  Ex. 3 at § 2(B).

17.     Under the Subcontract, ASB was required to provide traffic control for the Project pursuant to the terms of the General Contract.  Ex. 3 at Exhibit A.

18.     ASB's responsibilities under the Subcontract included providing a Traffic Control Supervisor for the Project pursuant to the terms of the General Contract.  Ex. 3 at Exhibit A.

19.     ASB's responsibilities under the Subcontract also included providing the traffic control devices for the Project.

20.     Under the Subcontract, ASB was required to "furnish all labor, supervision, tools, equipment, materials and supplies necessary for the performance of this Subcontract in a proper, efficient and workmanlike manner."  Ex. 3 at § 3(A).

21.    Under the Subcontract, ASB was required to "procure and maintain, at its own cost, a policy or policies of insurance sufficient to insure against all liability, claims, demands, and other obligations assumed by [ASB]." Ex. 3 at § 4(A).

22.    Under the Subcontract, ASB was required to "add Koss Construction Co. and its subsidiaries, affiliates, employees, as additional insured's [sic] to [ASB's] General Liability policy." Ex. 3 at § 4(A).

23.    Under the Subcontract, ASB must "indemnify, defend and hold harmless [Koss] from and against claims, damages, losses, and expenses including, but not limited to, attorney's fees and expenses arising out of or resulting from performance of [ASB's] Work under this Subcontract . . . to the extent caused in whole or in part by the negligent act or omission of the Subcontractor . . . ." Ex. 2 at § 15.

24.    Pursuant to the terms of the Subcontract, ASB employed a Traffic Control Supervisor, who set up the traffic control devices at the Project.

25.    For a time, ASB provided the traffic control devices and Traffic Control Supervisor for the Project.

26.    At some point while the Project was ongoing, ASB informed Koss that ASB mistakenly listed the bid amount for Traffic Control Supervisor to the Project as a monthly figure when it was supposed to be a weekly figure, causing ASB to significantly underbid the line item.

27.    ASB informed Koss that it could not afford to perform its obligations under the Subcontract.

28.    Koss began providing a Traffic Control Supervisor for the Project from 6:00 a.m. to 6:00 p.m., seven days per week.

29.    ASB continued providing a Traffic Control Supervisor for the Project from 6:00 p.m. to 6:00 a.m., seven days per week.

30.    ASB continued providing the traffic control devices for the Project.

**C.    The Insurance Policies**

**i.    The Cincinnati Policy**

31.    Defendant Cincinnati issued a Commercial General Liability policy to ASB with the policy number CSU0018213 ("Cincinnati Policy").  A true and correct copy of a document that Cincinnati represents to be the Cincinnati Policy is attached as Exhibit 4 and incorporated by reference.

32.    The Cincinnati Policy was in effect on March 21, 2013. Ex. 4 at CIN 000001.

33.    Under the Cincinnati Policy, Koss is insured against ASB's "acts or omissions in the performance of [ASB's] ongoing operations." Ex. 4 at CIN 000048.

34.    Under the Cincinnati Policy, Koss is insured against "[t]he acts or omissions of those acting on [ASB's] behalf in the performance of [ASB's] ongoing operations."  Ex. 4 at CIN 000048.

35.    The Cincinnati Policy has policy limits of $1,000,000 per occurrence and a general aggregate limit of $2,000,000. Ex. 4 at CIN 000011.

**ii.    The National Policy**

36.    National Union Fire Insurance Company of Pittsburgh, Pa. issued a Commercial Excess Liability Policy to ASB with the policy number BE 025347470 ("National Policy").  A true and correct copy of a document that National represents to be the National Policy is attached as Exhibit 5 and incorporated by reference.

37.    The National Policy was in effect on March 21, 2013.  Ex. 5 at NAT 000002.

38.     The National Policy provides excess coverage to entities, including Koss, that are insured under the Cincinnati Policy.  Ex. 5 at NAT 000022, 29.

### iii.     The Old Republic Policy

39.     Plaintiff Old Republic issued a Commercial General Liability Policy to Koss with the policy number A-7DG-052013-00 ("Old Republic Policy").  A true and correct copy of the Old Republic Policy is attached as Exhibit 6 and incorporated by reference.

40.     The Old Republic Policy was in effect on March 21, 2013.  Ex. 6 at O_REP 000005.

41.     The Old Republic Policy had policy limits of $1,000,000 per occurrence and a general aggregate limit of $2,000,000.  Ex. 6 at O_REP 000002.

### D.     The Occurrence

42.     At approximately 7:45 a.m. on March 21, 2013, Robert Cannon was traveling along Interstate 40 in the vicinity of the Project when a piece of metal became lodged under his vehicle.

43.     Mr. Cannon brought his vehicle to a complete stop.

44.     Clyde Ritter, who was driving behind Mr. Cannon, brought his motorist assist vehicle to a complete stop.

45.     Dornell Dewindt, who was driving behind Mr. Ritter, brought his diesel tractor truck to a complete stop.

46.     John Wieczorkowski, who was driving behind Mr. Dewindt, brought his diesel tractor truck to a complete stop.

47.     Cathy Jarrett, who was driving behind Mr. Wieczorkowski, brought her Toyota Camry to a complete stop.

48.     Austin Jarrett, Ms. Jarrett's step-son, was a passenger in her vehicle.

49.     Jose Estrada, who was driving behind Ms. Jarett, brought the rental van he was driving to a complete stop.

50.     There were nine passengers in the rental van driven by Mr. Estrada.

51.     Brandon Whitt, who was driving behind Mr. Estrada, brought his diesel tractor truck to a stop.

52.     Charles Williams was driving a diesel tractor truck and was behind Mr. Cannon and the six stopped vehicles.

53.     Mr. Williams did not stop his vehicle.

54.     Mr. Williams's truck struck Mr. Whitt's truck, which struck Mr. Estrada's van, which struck Ms. Jarrett's Toyota Camry and forced it underneath Mr. Wieczorkowski's truck, which struck Mr. Dewindt's truck (the "Occurrence").

55.     Ms. Jarrett was allegedly injured in the Occurrence.

56.     Mr. Estrada and the passengers in his vehicle were allegedly injured in the Occurrence.

57.     Austin Jarrett was killed in the Occurrence.

**E.      The Underlying Lawsuit**

58.     On July 3, 2013, Ms. Jarrett and her husband Gregory Neil Jarrett, filed suit (the "Underlying Lawsuit") on behalf of themselves and their deceased son, Austin Jarrett (collectively the "Jarrett Plaintiffs"), against a number of parties, including Mr. Estrada, other drivers involved in the Occurrence and their employers, and various Toyota entities.

59.     On October 18, 2013, Mr. Estrada, the passengers in the van Mr. Estrada was driving, and the parents of certain passengers in the van Mr. Estrada was driving (collectively the

"Estrada Plaintiffs") filed a cross-claim and complaint in the Underlying Lawsuit against Mr. Whitt, Mr. Williams, their employers and certain "John Doe" companies.

60.     On January 13, 2014, the Estrada Plaintiffs filed an amended cross-claim that included claims against Koss Construction Company.  A true and correct copy of the Estrada Plaintiffs' amended cross-claim is attached as Exhibit 7 and incorporated by reference.

61.     On June 9, 2014, the Estrada Plaintiffs filed a second amended cross-claim that included claims against Koss.  A true and correct copy of the Estrada Plaintiffs' second amended cross-claim is attached as Exhibit 8 and incorporated by reference.

62.     The Estrada Plaintiffs allege that Koss "created, controlled, supervised, maintained and was otherwise responsible for an unreasonably dangerous and unsafe condition in their construction area by allowing, directing, instructing, ordering, failing to act, regulating, and obstructing or impeding traffic flow in an unsafe and imprudent manner, suddenly and without warning, thereby creating a traffic hazard." Ex. 7 at ¶ 61.

63.     The Estrada Plaintiffs allege that Koss "negligently and wrongfully controlled, maintained, managed, and supervised an unsafe and hazardous construction area in violation of private contract, state and federal laws, including the Manual on Uniform Traffic Control Devices (MUTCD) . . . ." Ex. 8 at ¶ 61.

64.     On June 19, 2014, the Jarrett Plaintiffs filed a second amended complaint that included claims against Koss Construction Company.  A true and correct copy of the Jarrett Plaintiffs' second amended complaint is attached as Exhibit 9 and incorporated by reference.

65.     On February 6, 2015, the Jarrett Plaintiffs filed an amendment to the complaint that included claims against Koss.  A true and correct copy of the Jarrett Plaintiffs' amendment to complaint is attached as Exhibit 10 and incorporated by reference.

66.     The Jarrett Plaintiffs alleged that "[p]rior to the [Occurrence] there were hazards and traffic control deficiencies" at the Project.  Ex. 10 at ¶ 46.

67.     The Jarrett Plaintiffs alleged that Koss "created a temporary hazard in it's [sic] construction zone by not providing adequate traffic control for traffic traveling east bound on I-40 and by not implementing a plan to adequately respond to incidents in it's [sic] construction zone." Ex. 10 at ¶ 47.

68.     The Jarrett Plaintiffs alleged that Koss "did not provide adequate resources for maintenance of traffic and traffic control for the safety of the traveling public."  Ex. 10 at ¶ 49.

69.     Koss tendered its defense in the Underlying Lawsuit to ASB.

70.     Cincinnati agreed to defend Koss in the Underlying Lawsuit based on its status as an additional insured under the Cincinnati Policy.  A letter from Cincinnati to Koss is attached as Exhibit 11 and incorporated by reference.

71.     Cincinnati, however, reserved its right to deny coverage for indemnity to Koss on the basis that the Cincinnati Policy does not provide coverage for Koss's own acts or omissions. Ex. 11 at 1.

**F.      Settlement Of The Underlying Lawsuit**

72.     Koss faced the risk of being found liable in the Underlying Lawsuit for amounts in excess of its insurance coverage.

73.     Cincinnati and National refused to tender policy limits to settle the Underlying Lawsuit on Koss's behalf.

74.     In order to protect Koss, Old Republic tendered its policy limits to Koss's counsel in the Underlying Lawsuit for the purpose of settlement.

75.     Koss's counsel in the Underlying Lawsuit reached a settlement with the plaintiff's in the Underlying Lawsuit.

76.     Old Republic contributed its policy limits of $1M to the settlement.

77.     Cincinnati contributed only $650,000 to the settlement.

78.     National did not contribute to the settlement.

79.     A fourth insurance company ("Starr"), which upon information and belief was an entity affiliated with STARR Companies, that provided excess coverage to Koss also contributed to the settlement.

## COUNT 1:  CONTRIBUTION

80.     Old Republic incorporates by reference paragraphs 1 through 79.

81.     ASB is contractually obligated to defend and indemnify Koss from all claims and damages "caused in whole or in part by the negligent act or omission" of ASB.  Ex. 3 at § 15.

82.     Koss is an additional insured under the Cincinnati Policy.

83.     Koss is an additional insured under the National Policy.

84.     The potential liability Koss faced in the Underlying Lawsuit was based in whole or in part on the allegedly negligent act or omission of ASB in performing its traffic control obligations under the Subcontract.

85.     The potential liability Koss faced in the Underlying Lawsuit was based in whole or in part on ASB's acts or omission in the performance of ASB's ongoing operations for Koss.

86.     The potential liability Koss faced in the Underlying Lawsuit was based in whole or in part on actions or omissions taken by Koss on ASB's behalf in performance of ASB's ongoing operations for Koss.

87.     ASB had a duty to indemnify Koss against any judgment in the Underlying Lawsuit.

88.     Cincinnati had a duty to indemnify Koss against any judgment in the Underlying Lawsuit.

89.     National had a duty to indemnify Koss against any judgment in the Underlying Lawsuit once the policy limits of the Cincinnati Policy are reached.

90.     Old Republic had no potential liability in the Underlying Lawsuit and no obligation to indemnify Koss until the Cincinnati Policy and National Policy were exhausted.

91.     Upon information and belief, Starr has elected to waive its claim for contribution from Cincinnati and National.

92.     Old Republic paid more than its share of a common liability by contributing the $1M limits of the Old Republic Policy to settle the claims against Koss in the Underlying Lawsuit when neither the Cincinnati Policy nor the National Policy were exhausted.

93.     Old Republic is entitled to contribution from Cincinnati in the amount of $350,000 and from National in the amount of $650,000.

### **PRAYER**

WHEREFORE, Old Republic General Insurance Corporation prays that this Court enter judgment in its favor and against Cincinnati Specialty Underwriters Insurance Company and National Union Fire Insurance Company of Pittsburgh, Pa., for attorneys' fees and costs, and for all other relief to which it is entitled.

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, AR  72201
Telephone: (501) 379-1700
Facsimile: (501) 379-1701
jfalasco@qgtlaw.com
sbolden@qgtlaw.com

By: /s/ Sarah Keith-Bolden
    Joseph R. Falasco (2002163)
    Sarah Keith-Bolden (2007235)

*Attorneys for Old Republic General Insurance Corporation*